NOT DESIGNATED FOR PUBLICATION

No. 127,924

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RONALD W. MCKNIGHT III,
*Appellant*,

v.

DAN SCHNURR, Warden,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; DANIEL D. GILLIGAN, judge. Submitted without oral argument. Opinion filed March 13, 2026. Affirmed.

*Ronald W. McKnight,* appellant pro se.

*Jon D. Graves,* legal counsel, Kansas Department of Corrections, for appellee.

Before HURST, P.J., MALONE and COBLE, JJ.

PER CURIAM: Ronald W. McKnight III filed a pro se habeas petition under K.S.A. 60-1501 alleging that prison officials engaged in an ongoing discriminatory practice of filing false disciplinary reports and providing false testimony against him based on his race and age. The district court summarily dismissed his petition without a hearing after finding McKnight failed to state a claim for relief. He now appeals.

Although McKnight has clearly shown officers gave false testimony about his conduct that resulted in disciplinary proceedings—this court cannot say that conduct—although disappointing and inappropriate—demonstrates or constitutes evidence of race

1

or age discrimination. Finding no error in the summary dismissal, the district court is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

McKnight, an inmate at Hutchinson Correctional Facility (HCF), filed a habeas petition pursuant to K.S.A. 60-1501 et seq. alleging he suffered discrimination based on his race and age. According to McKnight, HCF staff have a policy of creating false reports and producing false testimony against young African American inmates to keep them at a higher custody level. McKnight argued his disciplinary proceeding adjudications, discussed below, were based on racially motivated discrimination and perjured statements by staff and that without the racist customs and policies, he would not have been found guilty of the false allegations. McKnight submitted disciplinary proceeding reports and hearing records for three cases:  24-03-240E (Case A), 24-01-409E (Case B), and 24-02-166E (Case C).

*Case A*

The first disciplinary report alleges that on March 15, 2024, McKnight violated two rules:  K.A.R. 44-12-304, disobeying orders, and K.A.R. 44-12-502, responsibility for counts. The report states that an officer announced it was count time in McKnight's unit and told inmates to return to their bunks and remain there until count was cleared. According to the report, after this direction was given twice an officer found McKnight standing in the common area before count was cleared. McKnight entered a not guilty plea to each of the violations and said he was in his bunk.

The disciplinary hearing summary says that staff viewed video of the incident showing McKnight was not out of his bunk—which confirmed McKnight's statement and

2

contradicted the officer's report. The hearing officer found McKnight not guilty of both rule violations. The adjudication was final on March 25, 2024.

*Case B*

The second disciplinary report alleges that on January 26, 2024, McKnight violated two rules: K.A.R. 44-12-304, disobeying orders, and K.A.R. 44-12-305, insubordination or disrespect. The report says McKnight approached the officer station and told the officers he was headed to work, but that officers advised him he was not called and to return to his bunk. According to the report, McKnight began arguing, "'I can just fucking go like I do everyday,'" and then the officers gave him a second order to return to his bunk to which McKnight replied, "'Fuck this.'"

McKnight requested witnesses and to review videos from the East Unit Dorm 1 cameras at the disciplinary hearing. McKnight alleged the cameras would show he promptly complied with the officer's order to return to his bunk and that he did not argue but merely explained to a staff member that did not know it was typical for workers to leave without prompting. McKnight's witness request contains a statement from another inmate indicating the other inmate was allowed to report to work at the same time McKnight was told to return to his bunk. The inmate's statement also spoke to his observations in the treatment of McKnight:

> "I have also observed, that since McKnight has returned from Central he has been on his Best Behavior, and [an officer] came to the Cube and told McKnight 'they do not know how he got back out here but they are watching him and will [unreadable] him back to Central for anything.'"

McKnight entered not guilty pleas to the allegations that he disobeyed orders and disrespected officers. The other inmate affirmed the testimony he provided in his written statement; testified that inmates go to work in the gym right after meal line; and said that

3

he went to work that day, but the same officer did not let McKnight go to work. An officer submitted a volunteer statement that provided: "'McKnight works in the gym. The dorms generally allow them to come out right after meal line. Just a little info. I don't know what else happened.'"

When the hearing officer asked McKnight if he used the language described in the report, McKnight replied, "'I cussed at my homeboy. All I said was "They on some bullshit." I didn't cuss at her. When she told me I couldn't go to work, I went back to my pod.'" The reporting officer testified, "'He was cussing at me. There was nobody else in the dayroom.'" The summary says the video showed McKnight enter the dayroom and walk up to the officer's station window; he talked with officers through the paper port then walked back to C-pod; three minutes later, McKnight returned to the station and spoke to officers through the paper port; and a few seconds later, McKnight returned to C-pod. The summary also states that the video showed McKnight speaking to no other residents in the dayroom. Finally, the hearing officer asked another officer if he witnessed McKnight being disrespectful towards the reporting officer. The second officer replied, "'Yes, Mr. McKnight has a very poor attitude.'"

The hearing record shows McKnight was found guilty of violating K.A.R. 44-12-305—insubordination or disrespect—and not guilty of K.A.R. 44-12-304—disobeying orders. McKnight received a copy of the disposition of his case on February 20, 2024, and had 15 days to appeal. McKnight's signature on his appeal is dated March 6, 2024. The document states it was received by a unit team staff member on March 18, 2024, and the "Received" stamp is dated March 19, 2024. HCF Disciplinary sent a letter to McKnight on March 19, 2024, informing him that his appeal was untimely. In a letter to Jeff Zmuda, Secretary of Corrections, McKnight requested consideration of his disciplinary report appeal pursuant to K.A.R. 44-13-701. McKnight asserted he hand-delivered his appeal to security staff on March 6, 2024, and that his unit team apparently received his appeal from security staff on March 8, 2024—two days after he delivered it

4

to them. McKnight argued his appeal was due on or before March 7, 2024, his filing was timely under the prison mailbox rule when he gave it to prison staff for processing, and prison officials' delay should not be attributed to him. The Secretary denied McKnight's appeal as untimely. This action was final as of April 8, 2024, at the latest.

*Case C*

The third disciplinary report alleges that on February 11, 2024, McKnight violated two rules: K.A.R. 44-12-328, undue familiarity, and K.A.R. 44-12-304, disobeying orders. The report states that McKnight arrived at the clinic for a health assessment; entered an exam room with a nurse and, before sitting down, began shutting the exam room door; and that he was told to stop and told the door must stay open for security reasons. The report alleges that McKnight sat down in the patient chair and very shortly thereafter was seen moving the exam room door with his feet and slowly closing it. The nurse allegedly told McKnight to stop and moved the door all the way open and away from McKnight. The report alleges that during his assessment, McKnight expressed he would illegally obtain medications if medical staff refused to give him what he wanted and shared that he could get what he wanted and had the means to do so. It also alleges McKnight told the nurse personal information about his relationship with his ex-girlfriend and his custody arrangement.

McKnight submitted a letter in which he asserted that someone issued a false report to the unit team staff that he faked a need for a blood pressure check to get to the nurses, which he believed was used to influence the disciplinary report and his administrative move to Central Unit. He stated that the nurse should have been able to verify he was scheduled for the clinic. McKnight also said that when he entered the exam room, he started to close the door "as was done in the past" because he was discussing private health information. McKnight asserted that he did not keep trying to shut the door after directed not to, and he requested video review. McKnight stated that he asked for

5

cream for a scar under his eye; when the nurse said she would look into it and see if it could be approved, he told her if they would not issue it to him then they could at least give him the name so he could try to get it himself. McKnight argued that the request was not inappropriate in any way and that the wording of the report was intended to inflame passion rather than state true facts.

Regarding the discussion of his ex-girlfriend, McKnight conceded that he told the nurse he was single and had an ex but only in response to questions about his children. McKnight said he was asked if he had children every time he went to clinic, and it was never an inappropriate topic before this occasion. McKnight stated he "at no time ever asked any personal or inappropriate questions of the [reporting officer] and the [disciplinary report] does not actually allege any such behavior." McKnight argued he did nothing wrong in his conduct at the clinic. He stated that he wanted the door closed so others would not hear about his private health concerns; when the nurse stated she wanted it left open, he never tried to close it again; and while he had his toes on the door and was fidgeting with it he had no intention of closing it.

Finally, McKnight stated that a couple of officers were upset when he was brought back from "Central," and one told him they would be looking for a reason to send him back. McKnight stated that though the nurse may have had concerns about his comments about obtaining the cream or about closing the door, he had no bad intentions and he "earnestly believe[d] that the [disciplinary report] was tweaked to sound as it does, to have [him] sent back to Central."

McKnight entered not guilty pleas to the allegations that he disobeyed orders and engaged in undue familiarity with the nurse during the health assessment. According to the disciplinary hearing summary, McKnight testified: "'I told [the nurse] I needed cream for my eye. I was talking about when I wrestled. I had an injury to my eye. She was asking me questions about my eye. I was just explaining to her what happened.'"

6

McKnight asked the nurse why she wrote him up for undue familiarity if she was asking about his family, to which she replied, "'I just needed to know if you had a support system outside of here. It was part of the health assessment.'" McKnight then stated that the nurse asked him about his family, and she replied that she did not ask about family. McKnight asked, "'Isn't a support system family? When she ask[ed] about my support system, I explained my family.'"

During the hearing, McKnight also testified that he did not know the door needed to stay open. According to the hearing summary, two officers viewed video coverage of the incident. The summary states the video showed McKnight in the exam room; McKnight walked behind the nurse; the reflection in the window showed the door was open; McKnight closed the door, then opened it again; later, the door closed again when the nurse was not near the door but was visible across the room and McKnight was the closest person in the room to the door. The hearing officer found McKnight guilty of violating K.A.R. 44-12-304— disobeying orders—and not guilty of violating K.A.R. 44-12-328—undue familiarity.

McKnight appealed the decision and explained:

"I NEVER Disobeyed any Orders! Only when I first went into the Observation/Exam Room did I start to shut the door, for my Privacy. When the RO said to Open It I did as Directed and did so Promptly. While I was nerv[ous] and fidgeted with the door with my foot while we was talking. I never tried to close the door, nor did the door ever even come close to closing. What was seen in the video was only partial movement, not any closing of the door. The RO said 'stop' and I promptly complied. There was no other issue with the door, and there was No Direct Order in which I could have violated! Seems the H.O. made a finding of guilt on something to make the RO feel better about the DR issue as I was Innocent of Both Charges. Pursuant to KAR 44-13-70l(a) (4)&(9), I ask for a Revocation of conviction or a Reduction to Insubordination K.A.R. 44-12-305."

The disciplinary appeal document gives March 18, 2024, as the filing date and the date the unit team signed the appeal as received.

After review, the Secretary affirmed the decision after finding: (1) substantial compliance with departmental and facility standards and procedures; and (2) the hearing officer's decision was based on some evidence. This action was final on April 9, 2024.

*Habeas Petition*

On May 8, 2024, McKnight filed his habeas petition using Cases A, B, and C, discussed above, as examples alleging a policy of staff filing false disciplinary reports based on his race and age. According to McKnight, the guilty disciplinary adjudications result in African American inmates being held at higher custody levels than other inmates. He also alleged that due to the guilty adjudications, his sentence was extended by 32 days and he was kept from work release.

As relief, McKnight requested a hearing and for the district court to set aside the disciplinary adjudications from Cases B and C. He also requested an order finding HCF violated McKnight's constitutional rights; ordering HCF to create a record of all disciplinary reports and turning them over to the district attorney's office for review; and ordering HCF to implement a new policy and training for officers.

*Order Summarily Dismissing McKnight's Petition*

The district court summarily dismissed McKnight's petition stating that the exhibits showed HCF's "hearing officers acted appropriately by finding [McKnight] not guilty of crimes when it found insufficient evidence, and guilty when it did." The court found there was nothing in the petition indicating the actions were racially motivated.

8

Finally, the court turned to McKnight's request to set aside his disciplinary adjudications. The court held that review of the exhibits supported the findings of the hearing officer and "some evidence support[ed] the convictions in the form of sworn testimony and video." The court determined there was "nothing in the attached exhibits, beyond [McKnight's] conclusory allegations, to indicate any form of racism." The court denied McKnight's request to set aside his disciplinary adjudications.

*Motion to Alter or Amend*

On June 3, 2024, McKnight filed a motion to alter or amend under K.S.A. 60-259(f). McKnight's motion asserted that when the district court conducted its screening of his petition under K.S.A. 60-1503(a), "it apparently identified a civil rights violation contained therein under 42 U.S.C. § 1983, and then found the pleadings insufficient to state a claim." McKnight argued the district court misconstrued and misstated facts when it addressed each of his cases. In Case A, McKnight argued the district court erred by stating there was no indication the officer testified under oath or was present at the hearing to support perjury as alleged. McKnight asserted that the exhibit included the statutory definition of perjury and a copy of the document signed by the officer under penalty of perjury that the allegations were true and correct. McKnight conceded that he did not attach the original that contained the officer's signature because it was a computer-generated report, which was retained by Dan Schnurr (Warden).

McKnight's motion concluded:

"Because Petitioner has shown Perjury under § (a)(2) of K.S.A. 21-5903, in Exhibits 'A' A-2, and 'B' B-10, and the Fact that Petitioner was moved from low medium to maximum and should be minimum custody based upon these perjured written statements, he has sufficiently stated a claim upon which relief can be granted by the loss of 31 days good time which has increased his prison sentence."

9

McKnight also attached a motion to amend findings and make additional findings under K.S.A. 60-252(b). McKnight requested the court reconsider the summary dismissal of his K.S.A. 60-1501 petition and replace its erroneous facts and law with the facts and law provided in his motion.

*Denial of McKnight's Motions Seeking Reconsideration*

The district court denied McKnight's motions. The court found that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. The court noted that proceedings on habeas petitions filed under K.S.A. 60-1501 were not subject to ordinary rules of civil procedure and that McKnight's right to discovery was more limited. The court stated there was "simply no proof of racial discrimination," affirmed its prior findings, and denied McKnight's motion.

As to McKnight's claims that he was denied an appeal process under K.A.R. 44-13-703, the court stated that it heard his appeal and dismissed it—not for untimeliness or failure to exhaust administrative remedies, "but on its lack of merit." The court found that by stating in his motion that he was not asserting an insufficient evidence claim, McKnight acknowledged that "'some evidence'" supported the adjudications.

McKnight now appeals.

DISCUSSION

On appeal, McKnight argues the district court erred in summarily denying his habeas petition. It appears that McKnight contends that he properly raised an equal protection claim alleging race and age discrimination and also seeks review of the disciplinary hearing determinations in Cases B and C. When a district court summarily dismisses a habeas petition, this court reviews that determination de novo "to determine

10

whether it plainly appears from the face of the petition and any supporting exhibits that the plaintiff is entitled to no relief." *Denney v. Norwood*, 315 Kan. 163, 175, 505 P.3d 730 (2022).

To the extent McKnight raised additional issues in his motion to alter or amend or in his brief to this court, those issues are not preserved for appellate review. See *In re N.E.*, 316 Kan. 391, 407, 516 P.3d 586 (2022) (issues not raised before the district court cannot be raised on appeal); *Sierra Club v. Mosier*, 305 Kan. 1090, 1122, 391 P.3d 667 (2017) (generally, a party cannot raise a new issue in a motion seeking reconsideration). While appellate courts typically do not address issues raised for the first time on appeal, there are recognized exceptions to that prohibition. However, a party must explain why the newly raised issues are properly before the court—i.e., they must invoke an exception. See Supreme Court Rule 6.02(a)(5) (2026 Kan. S. Ct. R. at 36) ("If the issue was not raised below, there must be an explanation why the issue is properly before the court."). McKnight cites no exception compelling this court's review of unpreserved claims, and only issues raised in McKnight's petition will be considered in this court's review. See *Schutt v. Foster*, 320 Kan. 852, 855-56, 572 P.3d 770 (2025).

Regarding the disciplinary cases, Warden argues that because McKnight mentions only Case B in his brief, he has waived any challenge of Cases A and C. Kansas courts liberally construe the pleadings of pro se litigants like McKnight. See *Joritz v. University of Kansas*, 61 Kan. App. 2d 482, 498-99, 505 P.3d 775 (2022) (noting that liberal construction refers only to arguments properly before the court). To be clear, McKnight was found not guilty in Case A—so it appears McKnight included Case A to show an example of prison officials giving false statements against McKnight in support of his equal protection claim. Therefore, McKnight does not seek appellate review of the disciplinary proceedings in Case A, and no further proceedings are necessary. A review of McKnight's brief in conjunction with his district court filings demonstrates that McKnight seeks review of the disciplinary proceedings in Cases B and C. The record is

11

not clear as to when McKnight received the Secretary's notice in Case B, and thus this court will include it in the review even though there are questions about the timeliness of McKnight's appeal.

To properly state a claim for relief under K.S.A. 60-1501 and avoid summary dismissal, an inmate must allege prison officials have subjected them to "shocking and intolerable conduct or continuing mistreatment of a constitutional stature." *Johnson v. State*, 289 Kan. 642, 648, 215 P.3d 575 (2009). "[I]f it is apparent from the petition and attached exhibits that the petitioner is entitled to no relief, then no cause for granting a writ exists and the court must dismiss the petition." *Denney*, 315 Kan. at 173; see also K.S.A. 60-1503(a). In conducting a review, this court assumes the facts alleged by McKnight are true, and if the facts support McKnight's claim under any theory, it must reverse the summary dismissal. *Washington v. Roberts*, 37 Kan. App. 2d 237, 240, 152 P.3d 660 (2007).

*Exhaustion of Administrative Remedies*

Warden argues McKnight failed to exhaust his administrative remedies as to Case B. Inmates must exhaust their administrative remedies before seeking judicial relief, including when pursuing habeas petitions. K.S.A. 75-52,138; see also *Battrick v. State*, 267 Kan. 389, 398, 985 P.2d 707 (1999). Whether a party is required to or has failed to exhaust administrative remedies is a question of law over which the appellate court's review is unlimited. *Boyd v. Werholtz*, 41 Kan. App. 2d 15, 16, 203 P.3d 1 (2008).

McKnight's disciplinary violations are classified as class I or class II offenses. K.A.R. 44-12-304; K.A.R. 44-12-305. The administrative procedure established for an inmate seeking review of class I and II offense adjudications is:  (1) a disciplinary hearing overseen by a hearing officer; (2) a review of the case, without the presentation of further arguments from either side, regarding compliance with the disciplinary

procedure, and (3) the right to appeal on the record to the Secretary from a final decision made by the hearing officer, after review of the decision by the warden. K.A.R. 44-13-403(a); K.A.R. 44-13-701(a); K.A.R. 44-13-703(a). Appeals to the Secretary must be made within 15 days following the inmate's receipt of the final action. K.A.R. 44-13-703(a), (c).

McKnight asserts he exhausted administrative remedies in both Cases B and C. There is no dispute that McKnight exhausted administrative remedies in Case C. The Secretary reviewed McKnight's appeal and approved the disciplinary hearing decision on April 9, 2024, finding: (1) substantial compliance with departmental and facility standards and procedures; and (2) the hearing officer's decision was based on some evidence. However, the Secretary returned McKnight's appeal in Case B as untimely. Although McKnight sent a letter to the Secretary seeking application of the prison mailbox rule, the Secretary denied the request and found McKnight's appeal untimely based on the date the unit team signed the appeal. Therefore, McKnight failed to exhaust the administrative remedies, which typically precludes this court's review of the disciplinary proceedings. See, e.g., *Chelf v. State*, 46 Kan. App. 2d 522, 533, 263 P.3d 852 (2011) (finding "the exhaustion requirement set forth in K.S.A. 75-52,138 is a mandatory, but nonjurisdictional, prerequisite . . . that must be strictly enforced by the court"). However, this court can review the Secretary's final determination that McKnight's appeal from Case B was untimely.

McKnight contends he gave his appeal for Case B to security staff on March 6, 2024, which would have made it timely since appeals must be taken within 15 days of disposition. K.A.R. 44-13-703(c). McKnight's signature on his appeal form shows a handwritten date of March 6, 2024. He maintains staff said they would submit his appeal but that it was not submitted until March 8, 2024. McKnight argues the mailbox rule and rules akin to equitable estoppel should apply because he gave the filing to a prison official or employee, and he should not be estopped from seeking review because that

prison official failed to timely deliver the appeal. While exhaustion under K.S.A. 75-52,138 is mandatory, it does not affect jurisdiction. Thus, failure to exhaust may be subject to equitable defenses, such as estoppel and waiver. *Chelf*, 46 Kan. App. 2d at 533. In the interest of justice and judicial economy, the court will review the disciplinary proceedings in both Cases B and C.

McKnight was also required to exhaust administrative remedies regarding his equal protection claims. *Sperry v. McKune*, 305 Kan. 469, 483, 384 P.3d 1003 (2016). The administrative procedures for inmate grievance procedures are outlined in state regulations and there is also a separate grievance procedure for "[s]pecial kinds of problems," which an inmate may use to raise an issue without going through the standard grievance procedure. K.A.R. 44-15-101(d); 44-15-102; K.A.R. 44-15-201. This special procedure, which involves mailing a sealed letter to the warden, Secretary, or the pardon attorney, is reserved for the "most difficult and complex problems." K.A.R. 44-15-201(a).

McKnight argues the administrative grievance procedure was unavailable to him because it cannot be "used in any way as a substitute for, or as part of, the inmate disciplinary procedure [or] the classification decision-making process." K.A.R. 44-15-101a(d)(2). Arguably, McKnight's claim that HCF staff abused the disciplinary procedures is different than an attempt to use the grievance procedure to, for example, seek reconsideration of an adjudication or as an avenue to present additional evidence regarding a disciplinary proceeding. See *Beem v. McKune*, No. 98,575, 2008 WL 496164, at *3 (Kan. App. 2008) (unpublished opinion) (finding inmate could use grievance procedure to complain about the way the hearing officer's decision was made in a disciplinary proceeding). But compare *Sundgren v. Schnurr*, No. 115,593, 2016 WL 6659514, at *2-3 (Kan. App. 2016) (unpublished opinion) (finding inmate attempted to substitute the grievance procedure for the disciplinary procedure when he "challeng[ed] the mishandling of evidence in his disciplinary case, the impartiality of the hearing

officer, his conviction of possessing dangerous contraband, and the punishments imposed").

Though McKnight's allegations clearly implicate his disciplinary proceedings, they transcend appeal of any single case. But, even if the standard grievance procedure was unavailable to McKnight, he could have attempted to use the special procedure for complex and difficult problems. If officials believed McKnight's claims did not constitute the requisite complexity or difficulty, they could have instructed him to use the standard grievance procedure. McKnight failed to even attempt to use either grievance procedure. However, Kansas courts do not require exhaustion of administrative remedies when such remedies are inadequate or when such efforts are futile. *In re Pierpoint*, 271 Kan. 620, 623, 24 P.3d 128 (2001); *Chelf*, 46 Kan. App. 2d at 537. McKnight does not fully develop any arguments about the futility of any grievance procedure except to assert in his petition that the grievance procedure was unavailable to him. Nevertheless, for the sake of completeness, and based on the unique position of McKnight's arguments, this court will assume that given McKnight's repeated disciplinary appeals, his efforts at administrative remedies for the equal protection claim would have been futile.

*Constitutional Claims*

McKnight's petition alleges discriminatory policies at HCF violated his right to equal protection under the United States and Kansas Constitutions. The Fourteenth Amendment to the United States Constitution and section 1 of the Kansas Constitution Bill of Rights both prohibit a state from denying any person equal protection under the laws. *Downtown Bar and Grill v. State*, 294 Kan. 188, 192, 273 P.3d 709 (2012).

Constitutional equal protection rights are implicated when the state treats classes of people differently based on their protected class status. *Hodges v. Johnson*, 288 Kan. 56, 72, 199 P.3d 1251 (2009). The guiding principle of equal protection is that similarly

15

situated individuals should be treated alike. *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). McKnight's state equal protection claims are given "much the same effect" as the federal claims. *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005).

Without direct evidence of racial animus, McKnight must show that he was treated differently than others similarly situated and that the disparate treatment was based on his race or age. See *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018). When discrimination is based on a protected status from selective enforcement, the plaintiff must show:

> " (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Meyer Land & Cattle Co. v. Lincoln County Conservation Dist*., 29 Kan. App. 2d 746, 755, 31 P.3d 970 (2001) (citing *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 [2d Cir. 1999]).

People are similarly situated for equal protection purposes when they are alike "in all relevant aspects." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992). When a prisoner alleges unconstitutional discriminatory treatment, they must provide data supporting allegations of disparate treatment. Such information includes the specific nature of the conduct of inmates, the inmates' history of conduct while incarcerated, the personal features distinguishing the inmates, and the details of disparate treatment regarding discipline or sanctions. See, e.g., *Abdulhaseeb v. Calbone*, 600 F.3d. 1301, 1322-23 (10th Cir. 2010) (inmate's conclusory, vague allegations without specific facts of similarly situated inmates treated differently insufficient to maintain claim of equal protection violation); *Whitney v. Wetzel*, 649 F. Appx. 123, 128 (3d Cir. 2016) (unpublished opinion) (no equal protection violation when inmate failed to provide

16

information on different discipline or sanctions or personal information about other allegedly similarly situated inmates).

Statistics showing racial discrimination can be used to establish an equal protection claim, but they must show more than mere correlation—they must show conduct based on race. *United States v. Mesa-Roche*, 288 F. Supp. 2d 1172, 1195 (D. Kan. 2003). Evidence of causation can include correlation, a lack of plausible alternative explanations, and temporal connection. 288 F. Supp. 2d at 1195.

McKnight contends prison officials made false statements against him in disciplinary proceedings based on his race and age. Therefore, absent that racially motivated discrimination, McKnight would not have been subjected to false reports and would not have the guilty adjudications or been placed in a higher security facility. McKnight has shown that prison officials made false statements in disciplinary reports against him as evidenced by the disciplinary record and not guilty adjudications in Case A. Moreover, evidence in Cases B and C shows, at a minimum, that prison officials subjected McKnight to stringent adherence to the nuances of rules. While evidence that prison officials falsified or exaggerated disciplinary reports is disappointing—McKnight fails to show they were racially motivated. Even if this court assumes the prison officials falsified the disciplinary reports against McKnight in Cases A, B, and C—McKnight has not shown this treatment was different for him than other inmates. It is possible that these same prison officials make similar reports against other inmates regardless of race or age.

McKnight simply offers no evidence of disparate treatment based on his race or age. Some of the strongest evidence includes McKnight's roommate's testimony in Case B that he was allowed to report to work without question while McKnight was written up; and the roommate's testimony and McKnight's own claim that an officer told McKnight that officers were watching him and looking for a reason to send him back to Central. In Case B, McKnight claimed that white workers were not required to wait to be

called to go to work and he was, but he also admitted at the disciplinary hearing that he used a curse word in the phrase "[t]hey on some bullshit" in response to the officer telling him to return to the pod—which is why he was found guilty only of disrespect and insubordination. McKnight offers no colorable claims that his treatment is different from other similarly situated inmates of a different race or age—let alone that his treatment is improperly motivated by race or age.

At best, this evidence alone merely supports the possibility that HCF staff dislike McKnight and are seeking ways to penalize him—not that they are discriminating against him based on his age or race. Because McKnight has not alleged that the disciplinary reporting procedure is applied differently based on race or age, his equal protection claim fails.

*Appeal from Disciplinary Proceedings in Cases B and C*

McKnight also seeks reversal of his guilty adjudications from Cases B and C. Allegations in a habeas petition must be made of "'shocking and intolerable conduct or continuing mistreatment of a constitutional stature.'" *Denney*, 315 Kan. at 173. McKnight essentially argues that he was denied a fair hearing because of the officers' alleged false reporting and testimony. "To gain court review of a prison disciplinary sanction, the inmate's claim under K.S.A. 60-1501 must assert the deprivation of some constitutionally protected interest" or face summary dismissal. *Hardaway v. Larned Correctional Facility*, 44 Kan. App. 2d 504, 504-05, 238 P.3d 328 (2010).

McKnight asserted in his petition that as a result of his disciplinary adjudications, he was placed in maximum security housing, his sentence was extended by 32 days, and he was kept from work release. Courts have made clear that an inmate has no protected liberty interest in remaining in the general prison population, housing, classifications, eligibility for rehabilitative programs, or employment. See *Murphy v. Nelson*, 260 Kan.

589, Syl. ¶ 9, 921 P.2d 1225 (1996) (general population versus separate population); *Gilmore v. McKune*, 23 Kan. App. 2d 1029, 1037, 940 P.2d 78 (1997) (housing, classifications, or employment); *Moody v. Daggett*, 429 U.S. 78, 88 n.9, 97 S. Ct. 274, 50 L. Ed. 2d 236 (1976) (classification or eligibility for rehabilitative programs). Further, when sanctions are suspended, they cannot impinge on a protected liberty interest. See *Hardaway*, 44 Kan. App. 2d at 505 ("Punishments never imposed do not implicate a protected liberty interest."). However, loss of good time credit does implicate a constitutionally protected liberty interest. *Howard v. United States Bureau of Prisons*, 487 F.3d 808, 811 (10th Cir. 2007).

Even if prison disciplinary proceedings implicate a constitutionally protected interest, such as a loss of good time credit, a prisoner must show they were denied due process in the hearing. In prison disciplinary hearings, due process is met if "'some evidence supports the decision by the prison disciplinary board.'" *May v. Cline*, 304 Kan. 671, 674, 372 P.3d 1242 (2016). Prison disciplinary proceedings carry different, arguably lower, due process standards than legal proceedings affecting nonincarcerated persons:

> "[D]ue process is satisfied in the context of an inmate disciplinary proceeding if there is any evidence in the record, even evidence which could be characterized as meager, that could support the conclusion of the disciplinary authority. Due process does not require that the evidence preclude other possible outcomes or conclusions, only that the evidence provides some support for the conclusion reached by the disciplinary authority such that the decision is not arbitrary." 304 Kan. at 674-75.

In Case C, McKnight was found guilty of disobeying orders by trying to close the exam room door when the nurse told him not to do so. The hearing testimony states that on review of the video footage of the incident, McKnight initially closed the door, and after it was opened the door was seen closing later when the nurse was across the room and McKnight was the closest person to the door. This constitutes "some evidence" supporting the only guilty adjudication in that case.

19

As to Case B, McKnight admitted he used profanity but said it was directed at another inmate. However, the video evidence showed McKnight approached the officers at the station twice and engaged in conversation—there were no other people visible in the video to whom he could have been speaking. Further, two officers testified he used profanity directed at one of the officers. He was found guilty only of disrespect, and not guilty of the other charge—that he disobeyed orders. There is some evidence supporting the guilty adjudication. While McKnight's not guilty adjudications in four of the six violations at issue in his disciplinary cases arguably show targeted or nefarious reporting by jail staff—they also show the functionality of the disciplinary procedure.

Having substantively reviewed all of McKnight's claims, his argument that the Secretary incorrectly found his appeal in Case B was untimely is unnecessary. There was some evidence supporting the disciplinary finding in Case B and this court has no reason to believe the Secretary would have concluded otherwise.

## CONCLUSION

McKnight failed to state facts sufficient to avoid summary dismissal of his habeas petition, and the record contains some evidence to support his disciplinary adjudications. Therefore, McKnight failed to show any error in the district court proceedings.

Affirmed.